The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Defendant,

Magyar Gordulocsapagy Muvek, Defendant–Intervenor.

Court No. 90–12–00687.

United States Court of International Trade.

March 11, 1992.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Charles A. St. Charles and Christopher J. Callahan, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, A. David Lafer, Jeanne E. Davidson and Jane E. Meehan, Washington, D.C. (Robert J. Heilferty, Atty.–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

Bryan, Cave, McPheeters & McRoberts, Peter D. Ehrenhaft and Lizbeth R. Levinson, Washington, D.C., for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Timken Company ("Timken"), moves pursuant to Rule 56.1 of the Rules of this Court for judgment upon the agency record to contest the determination of the International Trade Administration of the United States Department of Commerce ("Commerce" or "ITA") in *Final Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the Republic of Hungary* ("Final Results"), 55 Fed.Reg. 48,146 (1990).

### Background

On June 19, 1987, it was affirmatively determined by Commerce that tapered roller bearings from Hungary were being sold at less than fair value and dumped in the United States. *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the Hungarian People's Republic (Hungary); Antidumping Duty Order*, 52 Fed.Reg. 23,319 (1987).

This review covers Magyar Gordulocsapagy Muvek ("MGM"), the exporter who accounts for all Hungarian exports of tapered roller bearings to the United States for the period between June 1, 1988 through May 31, 1989. In its investigation, since Hungary is a non-market economy country, Commerce utilized the factors of production methodology to determine foreign market value. 19 U.S.C. § 1677b (1988). Accordingly, Portugal was selected as the surrogate country for purposes of valuing the factors of production. On January 12, 1990, Commerce sent a cable to the American Embassy in Lisbon, Portugal, seeking information for determining the factors of production reported by MGM. General Administrative Record ("GAR") (Pub.) Doc. 52. The Embassy responded to Commerce's cable on February 8, 1990 and provided Commerce with values for labor, factory overhead and indirect labor. GAR (Pub.) Doc. 54. The labor rates reported by the Embassy in that cable were lower than those previously submitted in the March 27, 1987 cable to Commerce. On March 2, 1990, Commerce asked the Em-

bassy to clarify certain items, but the Embassy did not adequately satisfy Commerce's request. GAR (Pub.) Doc. 60. On two other occasions, September 6, 1990 and October 9, 1990 (GAR (Pub.) Docs. 71 and 90, respectively), Commerce contacted the Embassy to provide source documentation for the factory overhead figures. None was provided. On September 27, 1990, Commerce published its preliminary determination in this review, finding a dumping margin of .91% *ad valorem*. *Preliminary Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the Republic of Hungary*, 55 Fed.Reg. 39,497 (1990). On November 19, 1990, Commerce published the final results of the administrative review, finding the final dumping margin to be 1.84%. Final Results, 55 Fed.Reg. 48,146.

### Standard of Review

Pursuant to 19 U.S.C. § 1516a(b)(1)(B) (1988), in reviewing a final determination of the Commerce Department this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *The Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### Foreign Market Value Calculations

Since Hungary had a state-controlled economy during the time involved, its sales of tapered roller bearings cannot be used to determine foreign market value under 19 U.S.C. § 1677b(a)(1). Rather, foreign market value is determined by selecting an

appropriate non-state controlled economy and determining the prices or the constructed value of tapered roller bearings or similar merchandise in that country. 19 U.S.C. § 1677b(c). Under the "factors of production" methodology, Commerce constructs the market-economy equivalent of the state controlled economy's cost of production. It does so by identifying the factors of production utilized in producing the merchandise in the non-market economy including "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital costs, including depreciation." 19 U.S.C. §§ 1677b(c)(1) and (3). *See, e.g., China Nat'l Metals & Minerals Import & Export Corp. v. United States*, 11 CIT 859, 674 F.Supp. 1482 (1987); *Timken*, 12 CIT 955, 699 F.Supp. 300. Commerce thus assigns market-economy values, utilizing "to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the non-market economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

Commerce derived the value for Hungarian factors of production from data representing costs in Portugal, the selected surrogate.[1] Plaintiff contests Commerce's methodology in valuing two distinct factors of production: specifically, overhead and labor rates.

*Overhead*

■ Plaintiff contests, among other things, the market economy value used by the ITA in calculating assigned overhead. More precisely, plaintiff asserts that Commerce's reliance on an overhead rate (as a percentage of total manufacturing costs) of 24.3%, which was estimated with reference to the annual report of Rol Rolamentos, a Portuguese bearing producer, instead of the 30% rate stated in the February 8, 1990 telex from the U.S. Embassy in Lisbon, was unreasonable. *Motion of Plaintiff,*

*The Timken Company, for Judgment Upon the Agency Record and Memorandum of Points and Authorities in Support* ("Plaintiff's Motion") at 7–9.

Commerce, however, did not dismiss the 30% figure. On at least two occasions, it asked the Embassy in Lisbon to clarify the information received in its February 8, 1990 cable. Both times, the Embassy failed to respond. Therefore, Commerce based its overhead figure on the financial statement of Rol Rolamentos.

It is firmly established that "[w]henever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, [the ITA shall] use the best information otherwise available." 19 U.S.C. § 1677e(c); *Tehnoimportexport v. United States*, 15 CIT ——, ——, 766 F.Supp. 1169, 1176 (1991); *see also N.A.R., S.p.A. v. United States*, 14 CIT ——, ——, 741 F.Supp. 936, 941 (1990).

In *Tehnoimportexport*, Commerce based overhead costs on a Portuguese company related to a German antifriction bearing manufacturer under investigation. This was deemed as the best information available since Commerce did not receive responses to its questionnaires from the companies in the potential surrogate countries regarding their overhead costs.

Likewise, in the case at bar, since the Embassy in Lisbon did not respond to Commerce's requests for clarification, it relied on the best information available. Furthermore, "the consequence of failing to provide adequate and timely information is to leave Commerce with no alternative but to proceed with its review relying upon the best information available." *Ansaldo Componenti, S.p.A. v. United States*, 10 CIT 28, 38, 628 F.Supp. 198, 206 (1986). In this case, the best information available was the 1987 Rol Rolamentos financial statement used to calculate factory over-

---

1. Commerce stated: "We chose Portugal as the surrogate for valuing the factors of production because we were able to obtain more complete publically available data pertaining to Portugal than for other potential surrogate countries with comparable economies." 55 Fed.Reg. at 48,147.

head. Also, plaintiff has "offered no evidence that this data was inaccurate or had been manipulated." *Tehnoimportexport,* 15 CIT at——, 766 F.Supp. at 1177.

■ Furthermore, although the financial statement used by Commerce predates the review period, Commerce may disregard information submitted by a party for the relevant period and use other information if it is the best information available. *Rhone Poulenc, Inc. v. United States,* 13 CIT 218, 224, 710 F.Supp. 341, 346 (1989), *aff'd,* 899 F.2d 1185 (1990); *Uddeholm Corp. v. United States,* 11 CIT 969, 971, 676 F.Supp. 1234, 1236 (1987). "Once Commerce has exercised its discretion to use the best information available rule against a respondent, it is for Commerce, not the respondent to determine what is the best information." *Rhone Poulenc,* 13 CIT at 224, 710 F.Supp. at 346. In this case, Commerce was compelled to exercise the best information rule since it made several attempts to obtain further information regarding plaintiff's overhead statistics.

■ Commerce is not required to make unreasonable efforts in order to gather information. If Commerce makes a reasonable, good faith effort to obtain information then it has satisfied its job. Anything further would be an unnecessary burden and delay. As such, in the case at bar, Commerce's determination was reasonable as it selected the best information available.

Plaintiff relies on this Court's decision in *Timken,* 12 CIT 955, 699 F.Supp. 300, another antidumping investigation case involving a non-market economy. In *Timken,* Commerce possessed two telexes containing different cost quotations for raw materials and scrap value prices and Commerce provided "no contemporaneous rationale for concluding that one cost quotation in the telex is more appropriate than the other." *Id.* at 963, 699 F.Supp. at 307. The court remanded the issue so that Commerce could resolve the inconsistencies in the telexes. In this case, however, since the Rol Rolamentos financial statement

was available, Commerce acted more than reasonably in steering clear of the conflicting telexes.

Timken also argues that, even if the 30% factory overhead rate is not used, Commerce misconstrued the data contained in the Rol Rolamentos financial statement. For example, the financial statement showed only one account for raw materials, auxiliary and consumable products. Since there was no breakdown of these costs, Commerce attributed the entire amount to direct materials. Timken also claims that Commerce misconstrued indirect and direct taxes, personal expenditures, and provisions for the financial year.

Commerce's determination, however, "will not be overturned merely because the plaintiff 'is able to produce evidence ... in support of its own contentions and in opposition to the evidence supporting the agency's determination.'" *The Torrington Co. v. United States,* 14 CIT ——, ——, 745 F.Supp. 718, 723 (1990), *aff'd,* 938 F.2d 1276 (1991) (*quoting Hercules, Inc. v. United States,* 11 CIT 710, 755, 673 F.Supp. 454, 490 (1987)). Commerce's determination will be overturned only if the evidence introduced by plaintiff is "enough to convince the Court that a reasonable mind would not have found ITA's evidence sufficient to support its conclusion." *Tehnoimportexport,* 15 CIT ——, ——, 766 F.Supp. 1169, 1173 (1991) (*quoting Torrington,* 14 CIT at ——, 745 F.Supp. at 723).

In the case at hand, Commerce was compelled to use the best information otherwise available, the Rol Rolamentos financial statement, and Commerce's interpretation of the financial statement was reasonable as it is "not within the court's domain ... to reject a finding on grounds of a differing interpretation of the record." *Timken,* 12 CIT at 962, 699 F.Supp. at 306.

■ Furthermore, Timken claims that since Commerce lifted the 15% indirect labor figure from the February 8, 1990 cable, then this undercuts the ITA's contention that the cable was inherently unreliable.[2]

---

2. Commerce did not rely solely upon the 24.3% figure from Rol Rolamentos to calculate factory

Commerce, however, only determined the February 8 cable unreliable with respect to factory overhead and direct labor rates. Since the February 8 cable was the only source which proposed a value for indirect labor (15%) then Commerce acted reasonably in deeming the cable as the best information available for purposes of valuing indirect labor.

*Labor Rates*

■ Plaintiff also contests the ITA's determination of labor rates in their calculation of foreign market value. Plaintiff claims that Commerce "assigned to all labor hours reported a *single,* undifferentiated Portuguese rate published by the U.S. Bureau of Labor Statistics ["BLS"]," when they should have broken down the labor rates according to the level of skill. Plaintiff's Motion at 15. Plaintiff wanted Commerce to use the labor rates stated in the March 27, 1987 telex.[3]

The ITA stated in its final determination, that its reasoning for rejecting the March 27 telex was as follows:

> We compared labor rates provided by the American Embassy in Lisbon for two different time periods and were unable to reconcile contradictory data contained in those submissions. The BLS is responsible for monitoring and reporting labor rates worldwide, and, as such, is a reliable source of information for this purpose. Moreover, analysis of the BLS data indicates that it takes skill ratios into consideration.

55 Fed.Reg. at 48,148.

In the past, Commerce likewise has relied upon BLS data in valuing world-wide labor rates. *See Final Determinations of Sales at Less Than Fair Value; Antifric-tion Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania,* 54 Fed.Reg. 19,109, 19,111 (1989); *Urea From the Socialist Republic of Romania; Final Determination of Sales at Less Than Fair Value,* 52 Fed. Reg. 19,553, 19,556 (1987); *Urea From the U.S.S.R.; Final Determination of Sales at Less Than Fair Value,* 52 Fed.Reg. 19,557, 19,560 (1987); *Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the Socialist Republic of Romania,* 52 Fed.Reg. 17,433, 17,435 (1987).

Once again, Commerce deemed the BLS data as the "best available information"[4] after repeated attempts by Commerce to have the Embassy clarify its report. Furthermore, the BLS data is more reliable than the contradictory information provided by the Embassy in Lisbon.

"When Commerce is faced with the decision to choose between two alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly" if their selection is reasonable. *Tehnoimportexport,* 16 CIT at ——, 783 F.Supp. at 1406. This Court deems Commerce's selection reasonable. Furthermore, the scales are tipped in Commerce's favor when the information they choose is the best information available.

Conclusion

The Court holds that the ITA's calculation of foreign market value of merchandise, especially with regard to overhead and labor rates, was supported by substantial evidence and was otherwise in accordance with law.

---

overhead. Commerce reasoned that this rate most likely did not include indirect labor expenses. Therefore, Commerce sought a value for indirect labor to complete its overhead calculation and chose the only reasonable alternative.

**3.** The March 27, 1987 cable reported skilled and unskilled labor at 900 and 435 escudos per hour and the February 8, 1990 cable reported skilled labor at 378 escudos per hour and unskilled at 232 escudos per hour. Timken claims that there is a discrepancy between the figures con-tained in the two telexes because the figures contained in the February 8, 1990 telex reflect just base salaries and not fringe benefits. The telex on its face, however, explicitly states that the rates are "per hour including fringe benefits." Nevertheless, "traditionally fringe benefits ... are not included in the hourly rate." *Tehnoimportexport v. United States,* 16 CIT ——, 783 F.Supp. 1401, 1407 (1992).

**4.** *See* 19 U.S.C. § 1677e(c).

Accordingly, the determination of the International Trade Administration is affirmed in all respects.