**Slip Op. 05-42**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| NATIONAL CANDLE ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> DONGGUAN FAY CANDLE CO., LTD., TIJID, INC. (d/b/a DIJIT, INC.), and PALM BEACH HOME ACCENTS, INC., <br><br> Defendant-Intervenors. | Consol. Court No. 03-00172 |

[Court sustains <u>Final Results</u>.]

Dated: March 31, 2005

<u>Barnes & Thornburg</u> (<u>Randolph J. Stayin</u>) for Plaintiff National Candle Association.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Jeanne E. Davidson</u>, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>David S. Silverbrand</u>); <u>Arthur D. Sidney</u>, Of Counsel, Office of Chief Counsel for Import Administration, United States Department of Commerce, for Defendant United States.

<u>White & Case, LLP</u> (<u>William J. Clinton</u> and <u>Adams C. Lee</u>) for Defendant-Intervenors Dongguan Fay Candle Co., Ltd., TIJID, Inc. (d/b/a DIJIT, Inc.), and Palm Beach Home Accents, Inc.

## <u>OPINION</u>

**GOLDBERG, Senior Judge**: In this action, Plaintiff National Candle

Association ("National Candle") challenges the final determination of the United States Department of Commerce ("Commerce") in the third administrative review of the antidumping duty order covering petroleum wax candles in Petroleum Wax Candles From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 13264 (Mar. 19, 2003) ("Final Results"). Defendant-Intervenors Dongguan Fay Candle Co., Ltd., TIJID, Inc. (d/b/a DIJIT, Inc.), and Palm Beach Home Accents, Inc. (collectively "Fay Candle") also challenge certain aspects of the Final Results. The Final Results covers the period of review from August 1, 2000 through July 31, 2001. Pursuant to USCIT Rule 56.2, both National Candle and Fay Candle move for judgment on the agency record.

For the reasons that follow, the Court sustains the Final Results. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

## I.  STANDARD OF REVIEW

The Court will sustain the Final Results unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). To determine whether Commerce's construction of the statutes is in accordance with law, the Court looks to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). The first step of the test set forth in Chevron requires the

Court to determine "whether Congress has directly spoken to the precise question at issue."  Id. at 842.  It is only if the Court concludes that "Congress either had no intent on the matter, or that Congress's purpose and intent regarding the matter is ultimately unclear," that the Court will defer to Commerce's construction under step two of Chevron.  Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998).  If the statute is ambiguous, then the second step requires the Court to defer to the agency's interpretation so long as it is "a permissible construction of the statute."  Chevron, 467 U.S. at 842.  In addition, "[s]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron."  Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001) (interpreting United States v. Mead, 533 U.S. 218 (2001)). Accordingly, the Court will not substitute "its own construction of a statutory provision for a reasonable interpretation made by [Commerce]."  IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992).

## II.  DISCUSSION

### A.  Commerce's Decision to Apply Adverse Facts Available in Determining Fay Candle's Dumping Margin Is Supported by Substantial Evidence and Otherwise in Accordance with Law.

During the submission portion of the review at issue, Commerce provided multiple questionnaires to Fay Candle in an

effort to obtain detailed production information.  Defendant's
Memorandum in Opposition to Plaintiff's Motion for Judgment Upon
the Agency Record ("Def.'s Br.") at 8.  Prior to conducting
verification of the questionnaire responses, Commerce sent a
verification agenda to Fay Candle.  See Verification Outline for
2000-01 Administrative Review of Petroleum Wax Candles from the
People's Republic of China (PRC), Appendix of Public Documents in
Support of Defendant's Memorandum in Opposition to Motions for
Judgment Upon the Agency Record ("Def.'s App.") at Ex. 2 (July
11, 2002).  The letter stated that "verification is not intended
to be an opportunity for submitting new factual information.  New
information will be accepted at verification only when (1) the
need for that information was not evident previously, (2) the
information makes minor corrections to information already on the
record, or (3) the information corroborates, supports, or
clarifies information already on the record."  Id. at 2.

On the first day of verification in the People's Republic of
China ("PRC"), Fay Candle presented Commerce with what it
considered to be a "minor correction" to its questionnaire
responses.  Letter from Respondents to Secretary of Commerce,
Import Administration, Appendix Accompanying Plaintiffs'
(Dongguan Fay Candle Co., TIJID, Inc. (d/b/a DIJIT, Inc.) and
Palm Beach Home Accents, Inc.) Memorandum of Points and
Authorities in Support of Their USCIT R. 56.2 Motion for Judgment

Upon an Agency Record ("Def.-Intvrs.' App.") at Ex. 1 at 1 (July 22, 2002). This "minor correction" consisted of one unreported production order out of a total of ninety-six, and resulted in an approximate twenty-five percent increase in total production quantity from that which Fay Candle had originally reported. Memorandum of Points and Authorities in Support of Plaintiffs Dongguan Fay Candle Co., TIJID, Inc. (d/b/a DIJIT, Inc.) and Palm Beach Home Accents, Inc. ("Def.-Intvrs.' Br.") at 5, 7; Commerce PRC Verification Report, Def.-Intvrs.' App. at Ex. 6 at 1 (Aug. 30, 2002) ("Verification Report").

On the fourth and final day of verification, the verification team was instructed to reject the newly submitted information and halt the remainder of the PRC verification. Verification Report at 1-2. Commerce's actions were based on its finding that the correction submitted by Fay Candle was new factual information that was not submitted in accordance with Commerce's verification policy concerning minor corrections. Id. Further, Commerce determined that the new production order accounted for a "very large percentage" of Fay Candle's production and thus "was not minor in any sense of the word." Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review of Petroleum Wax Candles from the People's Republic of China, Def.'s App. at Ex. 1 at 23 (Mar. 10, 2003) ("Issues and Decision Memo"). In fact, Commerce was

concerned that "the fact that respondents did not notice the effect of an omission of such magnitude on their response calls into question the care they took in preparing that response." Id.

The following week, however, Commerce informed Fay Candle that it would proceed with the U.S. portion of verification, beginning on August 12, 2002. See Memorandum Regarding 2000/2001 Administrative Review on Candles from the People's Republic of China: Telephone Conversation Regarding U.S. Verification, to the File, from Sally C. Gannon, Def.'s App. at Ex. 6 (July 31, 2002). Thereafter, in a letter dated August 9, 2002, Fay Candle notified Commerce of its decision not to proceed with the U.S. verification because it felt there was "no point in proceeding." Letter From Law Firm of Sandler, Travis & Rosenberg to Secretary of Commerce, id. at Ex. 7 (Aug. 9, 2002).

Commerce subsequently published the Final Results, in which it concluded that adverse inferences were warranted in light of Fay Candle's decision not to proceed with the U.S. verification. See 68 Fed. Reg. at 13265. Specifically, Commerce stated that Fay Candle's "refusal to allow the U.S. verification to take place seriously impeded [Commerce's] ability to complete its analysis in this administrative review and leads to [the] conclusion that [Fay Candle] failed to cooperate by not acting to the best of [its] ability in this review." Issues and Decision

Memo at 8.

Fay Candle contends that Commerce abused its discretion by failing to consider that Fay Candle's initial misreporting of its total production quantity resulted from a clerical error. Def.- Intvrs.' Br. at 12. Alternatively, Fay Candle asserts that Commerce abused its discretion by waiting until the final day of verification in the PRC to reject the new production data and thereafter terminate the PRC verification. Id. at 19-20. By terminating the PRC verification prematurely, Fay Candle points out that Commerce failed to verify important production data, including hours of labor and the quantity of wicks used to produce petroleum wax candles, as required by 19 U.S.C. § 1677b(c)(3). Id. at 20. Without this necessary data, Fay Candle claims that application of adverse facts available was "a foregone conclusion," id. at 21, and thus it was reasonable for Fay Candle to refuse to proceed with the U.S. verification. Id. at 25-26.

The Court disagrees. Pursuant to 19 U.S.C. § 1677e(b), adverse inferences are warranted where "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]." In this case, Fay Candle's unilateral decision to cancel the U.S. verification simply cannot be viewed as anything but a failure to cooperate by not acting to the best of its ability to comply with

a request for information.  Furthermore, by intentionally canceling the U.S. verification, Fay Candle did not "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation[,]" as required by the Court of Appeals for the Federal Circuit in Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Fay Candle insists, however, that a party retains the right to cease cooperation in an ongoing review if it believes that the review is not proceeding in its favor.  Specifically, Fay Candle suggests that its decision to cancel the U.S. verification "cannot be viewed in isolation of" Commerce's "arbitrary and capricious administration of the [PRC] portion of the verification."  Def.-Intvrs.' Br. at 24, 27.  This argument is without merit.  Even if Commerce did abuse its discretion by terminating the PRC verification, that still does not justify Fay Candle's unilateral decision to cancel the U.S. verification. While Fay Candle may have believed that Commerce inappropriately rejected the new production data and prematurely halted the PRC verification, it should have utilized the proper procedural channels to seek redress for the perceived flaws in Commerce's administration of the review.  Specifically, Fay Candle should have proceeded with the review, participated in the U.S. verification, allowed Commerce to issue the Preliminary Results, and then argued in its case brief that Commerce abused its

discretion by prematurely terminating the PRC verification.
See 19 C.F.R. § 351.309(c) (setting forth requirements for
submitting case briefs to Commerce).  To cease cooperation in an
ongoing review, as Fay Candle did here, simply is not an
acceptable alternative for resolving disagreements.  If the Court
were to hold otherwise, every party to an administrative review
would immediately stop participating the moment Commerce makes an
unfavorable finding, and as a result, the record on appeal would
be incomplete in every instance, as it is here.  The Court cannot
condone such an untenable situation.[1]

Accordingly, because Commerce properly concluded that Fay
Candle failed to cooperate to the best of its ability, Commerce's
decision to apply adverse facts available is supported by
substantial evidence and otherwise in accordance with law.

**B.    Commerce's Decision to Apply a Dumping Margin of 65.02
       Percent as Adverse Facts Available Is Supported by
       Substantial Evidence and Otherwise in Accordance with Law.**

In the Preliminary Results, Commerce expressed its intention
to apply a dumping margin of 95.22 percent as adverse facts
available.  Notice of Preliminary Results of Antidumping

---

[1] The Court finds it unnecessary to reach the issue of
whether the new production data submitted by Fay Candle on the
first day of verification in the PRC should have been deemed a
"minor correction" resulting from clerical error, since any
ruling on this issue would not change the Court's holding that
adverse inferences are warranted because of Fay Candle's failure
to cooperate to the best of its ability by canceling the U.S.
verification.

Administrative Review: Petroleum Wax Candles From the People's Republic of China, 67 Fed. Reg. 57384, 57385 (Sept. 10, 2002) ("Preliminary Results").  This margin was taken from the most recent new shipper review of candles from the PRC and was the only rate calculated in the proceeding based on information supplied by a respondent.  See Petroleum Wax Candles from the People's Republic of China: Notice of Final Results of New Shipper Review, 67 Fed. Reg. 41395, 41396 (June 18, 2002); Proprietary Information Regarding Adverse Facts Available Rate, Appendix of Confidential Documents in Support of Defendant's Memorandum in Opposition to Motions for Judgment Upon the Agency Record at Ex. 1 (Mar. 10, 2003).  The 95.22 percent rate was calculated by taking the weighted-average margin of the only two products sold by the new shipper; the product-specific margins were 65.02 percent and 122.42 percent.  Id.

In the Final Results, however, Commerce determined that, for several reasons, it was inappropriate to apply the weighted-average margin of 95.22 percent as adverse facts available.  See 68 Fed. Reg. at 13265-66.  Instead, Commerce concluded that the product-specific margin of 65.02 percent was a more appropriate reflection of Fay Candle's actual dumping margin.  Id. at 13266. National Candle challenges this determination.

In selecting adverse facts, Commerce is permitted by statute to rely on information derived from "(1) the petition, (2) a

final determination in the investigation . . ., (3) any previous review under section 1675 . . . or determination under section 1675b . . ., or (4) any other information placed on the record." 19 U.S.C. § 1677e(b). "So long as the data is corroborated, Commerce acts within its discretion when choosing which sources and facts it will rely on to support an adverse inference." Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1339 (Fed. Cir. 2002). Where Commerce selects a previously calculated margin as adverse facts available, such information is corroborated upon a showing that it is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032, 1034 (Fed. Cir. 2000).

### 1. Commerce Properly Rejected the 95.22 Percent Weighted-Average Margin.

National Candle argues that Commerce's preliminary determination to apply a margin of 95.22 percent as adverse facts available was correct because it was an accurate estimate of Fay Candle's actual rate and was not unduly punitive. Motion for Judgment on the Agency Record and Case Brief in Support Thereof ("Pl.'s Br.") at 26. In support of this contention, National Candle draws the Court's attention to the fourth administrative review, in which Commerce preliminarily decided to assign a margin of 95.74 percent to Fay Candle as adverse facts available.

Notice of Preliminary Results and Preliminary Partial Rescission
of the Antidumping Administrative Review: Petroleum Wax Candles
From the People's Republic of China, 68 Fed. Reg. 53109, 53115
(Sept. 9, 2003).  According to National Candle, in light of this
subsequent determination by Commerce, the 95.22 percent margin
preliminarily assessed by Commerce in the third administrative
review must be viewed as a reasonably accurate estimate of
current industry practice.  Pl.'s Br. at 29.

The Court rejects this argument.  "[I]t is well established
that the record for judicial review should ordinarily not contain
material from separate investigations, including records of
separate administrative reviews arising out of the same
antidumping duty order, as is the case here." Sanyo Elec. Co. v.
United States, 23 CIT 355, 361, 86 F. Supp. 2d 1232, 1239 (1999)
(quotation omitted).  This means that "[a]ny information received
by Commerce after the particular determination at issue is not
part of the reviewable administrative record." Torrington Co. v.
United States, 16 CIT 76, 77-78, 786 F. Supp. 1027, 1029 (1992).
Accordingly, it would be improper for the Court to use the margin
preliminarily calculated by Commerce in the fourth administrative
review to profess, in hindsight, that the margin preliminarily
calculated by Commerce in the third administrative review was
reasonable.

National Candle also contends that when a respondent fails to cooperate, Commerce assigns the highest rate from any segment of the proceeding as adverse facts available.  Pl.'s Br. at 26. In this case, the highest rate from a prior segment of the proceeding was the 95.22 percent weighted-average margin preliminarily assigned by Commerce.  Id. at 27.  It is clear, however, that Commerce is not required to select the highest rate available when applying adverse facts to an uncooperative respondent.  See F.lli De Cecco, 216 F.3d at 1032; see also Ferro Union, Inc. v. United States, 23 CIT 178, 205, 44 F. Supp. 2d 1310, 1335 (1999) ("Commerce cannot assume the highest previous margin applies simply because it is the one most prejudicial to the respondent.").  Moreover, although there is a goal of deterrence inherent in § 1677e(b), "Congress tempered deterrent value with the corroboration requirement" so that "punitive, aberrational, or uncorroborated margins" would not be imposed as adverse facts available.  F.lli De Cecco, 216 F.3d at 1032.  In other words, Commerce cannot select "unreasonably high rates with no relationship to the respondent's actual dumping margin."  Id.

Here, Commerce determined that the weighted-average margin of 95.22 percent was unreasonably high because:

> The 95.22 percent margin was calculated for a new
> shipper, a trading company, whose single sale, albeit
> of more than one product, during the new shipper POR
> was also its first sale ever to the United States.
> Because of the substantial difference between the two
> margins calculated in the new shipper review (and

weight-averaged into the 95.22 percent margin) and the unusual facts surrounding the new shipper's one sale, the Department has determined that the application of the new shipper's weighted-average margin would be inappropriate. The wide range of the two margins weight averaged together in the new shipper review, given the nature of the new shipper as a start-up with very low sales volumes, and given other unusual proprietary facts surrounding the sale, has led us to find that it is inappropriate to use the higher of these two margins. Moreover, while the rate we have chosen (65.02 percent) is higher than the single PRC-wide rate that has been applied for the past 16 years (54.21 percent) under this order, it is still more in line with the 54.21 percent PRC-wide rate which was also based on facts available. The higher rate we have excluded [122.42 percent] is more than double that previous rate, confirming our conclusion that it is the product of circumstances not germane to this analysis.

Final Results, 68 Fed. Reg. at 13265-66. Moreover, it is not

unusual for Commerce to select a rate other than the highest-

available rate when applying adverse inferences. See, e.g.,

Notice of Final Determination of Sales at Less Than Fair Value:

Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan,

64 Fed. Reg. 24329, 24369 (May 6, 1999) (re-examining the

preliminary determination to use the highest-available margin as

adverse facts available and finding instead that the second-

highest margin should be used, since the highest margin "was not

sufficiently within the mainstream"); Fresh Cut Flowers From

Mexico; Final Results of Antidumping Duty Administrative Review,

61 Fed. Reg. 6812, 6814 (Feb. 22, 1996) (applying the second-

highest margin because the highest-available margin was

"unrepresentative" in that it was based on skewed cost-of-
production data).

Thus, Commerce acted within its discretion in finding that
the 122.42 percent product-specific margin, and in turn the 95.22
percent weighted-average margin, were unreasonably high and an
inaccurate estimate of Fay Candle's actual dumping margin.
Accordingly, the Court sustains Commerce's rejection of the
weighted-average margin.

> **2.   Commerce Did Not Err in Applying the 65.02 Percent
>        Product-Specific Margin**.

National Candle contends that Commerce's application of the
product-specific margin of 65.02 percent is not supported by
substantial evidence and otherwise in accordance with law for
three reasons.  Pl.'s Br. at 32.  First, National Candle suggests
that it should have been given an opportunity to comment on
Commerce's use of the 65.02 percent rate, since this reflected a
change from the 95.22 percent rate assigned in the Preliminary
Results.  See id. at 32-33.  Preliminary results, however, "are
'preliminary' precisely because they are subject to change."  NTN
Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir.
1995).  Thus, Commerce "need not reach the same result" in the
final results as it did in the preliminary results since "[t]he
purpose of publishing preliminary results is to discover
inaccuracies and correct them before coming to a final decision."
Pulton Chain Co. v. United States, 17 CIT 1136, 1140 (1993).  In

addition, "there [is] no obligation on the part of [Commerce] to notify the parties beforehand that there [will] be a different [rate] used in the final determination[] than in the preliminary." Tehnoimportexport v. United States, 15 CIT 250, 255, 766 F. Supp. 1169, 1175 (1991). As a result, National Candle's first argument is without merit.

Next, National Candle asserts that it was surprised by Commerce's selection of the 65.02 percent margin from the new shipper review, since it was the margin calculated for a type of candle never produced by Fay Candle during the period of review. Pl.'s Br. at 34. National Candle insists that if Commerce is going to apply a product-specific margin as adverse facts available, then it must select a product-specific margin based on the types of products actually produced and sold by the respondent during the period of review. Id. National Candle, however, cites no authority to support this contention, and the Court is aware of no statute or regulation requiring Commerce to apply product-specific margins in the manner National Candle advocates. Furthermore, while the new shipper produced only two types of candles and a margin was calculated for each candle, Fay Candle produced and sold many types of candles, none of which was identical to the candles produced by the new shipper. See Response of Dongguan Fay Candle Co., Ltd., to Antidumping Questionnaire Section D, Appendix Accompanying Plaintiff's Case

Brief Dated October 24, 2003 at Ex. 3 (Jan. 9, 2002).  Therefore, there is no product-specific margin from the new shipper review that would precisely mirror the candles produced and sold by Fay Candle in any event.

Finally, National Candle argues that the proprietary facts found by Commerce to be unusual and particular to the new shipper were not unusual at all, and were in fact reflective of "actual conditions in the U.S. candle market."  Pl.'s Br. at 34.  Again, however, National Candle cites no record evidence in support of its factually intensive argument regarding "actual conditions in the U.S. candle market" and the "significant price competition" that "U.S. candle producers have seen."  Id. at 34, 36.  As such, the Court finds this argument to be unavailing.

Accordingly, Commerce's decision to apply a dumping margin of 65.02 percent as adverse facts available is supported by substantial evidence and otherwise in accordance with law.

### III.  CONCLUSION

For the aforementioned reasons, the Court sustains the Final Results.  Judgment will be entered accordingly.


                                        /s/ Richard W. Goldberg
                                   **Richard W. Goldberg**
                                   **Senior Judge**

**Dated:      March 31, 2005**
             **New York, New York**