**KERR–McGEE CHEMICAL CORP., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**China Hunan International Economic Development (Group) Corporation, China Metallurgical Import & Export Hunan Corporation, and Minmetals Precious & Rare Minerals Import & Export Corporation, Defendant–Intervenors.**

**Slip Op. 97–170.
Court No. 96–02–00397.**

United States Court of
International Trade.

Dec. 10, 1997.

Gardner, Carton & Douglas, Washington, DC (W.N. Harrell Smith, IV, George N. Grammas), for plaintiffs Kerr–McGee Chemical Corporation and Elkem Metals Company.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Randi–Sue Rimerman), David J. Ross, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, Washington, DC, for defendant.

Dorsey & Whitney, Washington, DC (Munford Page Hall, II, Philippe M. Bruno), for defendant-intervenors China Hunan International Economic Development (Group) Corporation, China Metallurgical Import & Export Hunan Corporation, and Minmetals Precious & Rare Minerals Import & Export Corporation.

OPINION

CARMAN, Chief Judge:

Before this Court is plaintiffs' Motion for Judgment on the Administrative Record pur-

suant to U.S. CIT R. 56.2. Plaintiffs argue the Department of Commerce's ("Department" or "Commerce") *Notice of Final Determination of Sales at Less Than Fair Value: Manganese Metal From the People's Republic of China,* 60 Fed.Reg. 56,045 (Dep't Comm.1995) (final determ.) (*"Final Determination"*), *as amended, Notice of Amended Final Determination and Antidumping Duty Order: Manganese Metal From the People's Republic of China,* 61 Fed.Reg. 4,415 (Dep't Comm.1996) (am. final determ.) (*"Amended Final Determination"*) should be set aside as unlawful and the case should be remanded to Commerce for further consideration. Plaintiffs request this Court remand the case to Commerce for it to (1) value manganese ore using an appropriate price for chemically comparable ore rather than using the Indian selling price for metallurgical grade ore, and recalculate the subject merchandise's normal value accordingly; and (2) reconsider whether electricity consumption reported by the defendant-intervenors is below practical minimums for electrolysis and may not include electricity consumed in other processes in the course of manufacturing manganese metal.

Defendants disagree, arguing Commerce's determinations are supported by substantial evidence on the record and are otherwise in accordance with law and ask this Court to sustain Commerce's *Amended Final Determination.* Defendant-intervenors oppose plaintiffs' motion and support defendant's position. This Court has jurisdiction under 28 U.S.C. § 1581(c) (1994), and for the reasons set forth below, denies Plaintiffs' Motion for Judgment on the Administrative Record and affirms Commerce's *Amended Final Determination.*

## BACKGROUND

Plaintiffs, Kerr–McGee Chemical Corporation and Elkem Metals Company ("Kerr–McGee") are the sole producers of electrolytic manganese metal in the United States. The product is a virtually pure form of manganese used principally in the production of steel and aluminum sheet, but also in the manufacture of chemicals. Manganese metal is composed principally of manganese but also contains some impurities such as carbon, sulfur, phosphorous, iron and silicon. Manganese metal contains by weight not less than 95% manganese. It is produced only in the United States, South Africa, and more recently, in the People's Republic of China ("PRC").

Plaintiffs filed a petition on November 8, 1994, on behalf of the United States manganese metal industry, arguing Chinese companies were dumping manganese metal in the United States. Defendant-intervenors, China Hunan International Economic Development (Group) Corporation, China Metallurgical Import & Export Hunan Corporation, and Minmetals Precious & Rare Minerals Import & Export Corporation, are located in the PRC and export the subject merchandise to the United States.

### A. The Surrogate Value for Manganese Ore

The PRC is a country with a non-market economy. In antidumping investigations involving non-market economies, the Department is required to calculate the subject merchandise's normal value based on information regarding the factors of production in a surrogate country which has a market economy. The statute states if the merchandise subject to an antidumping investigation is exported from a country with a non-market economy, and "the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined," 19 U.S.C. § 1677b(c)(1)(B) (1994), Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1) (1994). The statute requires Commerce, in valuing the factors of production, to "utilize to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4) (1994). The factors of production utilized in producing

merchandise are defined to include hours of labor required in production, quantities of raw materials employed, amounts of energy and other utilities consumed and representative capital cost, including depreciation. *See* 19 U.S.C. § 1677b(c)(3) (1994). Once Commerce has determined an appropriate surrogate country, it will use information on costs in that country to value each factor of production used in the nonmarket economy country. *See* 19 U.S.C. § 1677b(c)(2) (1994).

Plaintiffs proposed India be used as the surrogate country for valuing the factors of production for the antidumping investigation, because although no market economy comparable to the PRC produces manganese metal, India is a country of similar economic development to the PRC and is a significant producer of merchandise similar to manganese metal. Commerce agreed "India [was] the most suitable surrogate" country for purposes of the investigation because "India is at a level of economic development comparable to that of the PRC, and Indian export statistic indicate that the country is a significant producer of comparable merchandise." *Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Manganese Metal From the People's Republic of China,* 60 Fed.Reg. at 31,282, 31,284 (Dep't Comm.1995) (prelim. determ.) *("Preliminary Determination "), as amended, Amended Preliminary Determination of Sales at Less Than Fair Value: Antidumping Duty Determination: Manganese Metal From the People's Republic of China,* 60 Fed.Reg. 37,875 (Dep't Comm. 1995).

Commerce calculated normal value based on the factors of production reported by the factories in the PRC which produced the subject merchandise for the exporters examined in the investigation. The factors used to produce manganese metal include materials, labor and energy. *See Preliminary Determination,* 60 Fed.Reg. at 31,284. To calculate normal value, Commerce multiplied the reported factor quantities by the appropriate surrogate values from India for those inputs purchased domestically from PRC

suppliers. Where a respondent failed to provide certain factor information in usable form, Commerce relied upon publically available information from the antidumping petition, as well as best information available in valuing the factors. *Id.* In determining which surrogate value to use for each factor of production, Commerce selected, where possible, an average non-export value, which was representative of a range of prices within the period of investigation, or most contemporaneous with the period of investigation, specific to the input in question, and tax-exclusive. *Id.*

In the process of reaching its *Preliminary Determination,* Commerce considered five ores as possible surrogates for manganese ore produced in China. Manganese ore is a primary input into the production of manganese metal. Neither Commerce nor any of the parties were able to locate a surrogate for manganese ore that was identical to the ore used to produce manganese metal in the PRC. In the absence of an identical ore, Commerce had to choose between a number of non-identical surrogate ores. The five potential surrogates were (1) a price submitted by plaintiffs for low ferruginous peroxide ore (82–84 percent $MnO_2$)[1] ("ore one"); (2) a price submitted by defendant-intervenors for metallurgical grade manganese ore (30–35 percent Mn) from the *1993 Indian Minerals Yearbook* ("ore two"); (3) an export price obtained by the Department for low-grade manganese ore (26–28 percent Mn content) based on an actual transaction price from the July 7, 1992 issue of the TEX Report,[2] reporting the price agreed to in a contract between an Indian mine and two Japanese purchasers for 25,000 tons of manganese ore ("ore three"); (4) a basket price based on grades of ore with a 30–35 percent manganese content obtained by the Department from the *Indian Export Statistics* ("ore four"); and (5) an average price obtained by Commerce for total Indian production of manganese ore, not differentiated by grade, during 1991–92, from the *1993 Indian Minerals Yearbook* ("ore five") (Def.'s Chron. of

---

**1.** Mn is the symbol for the element manganese. $O_2$ is the symbol for the element oxygen.

**2.** The TEX Report is a trade periodical.

Events ("Def.'s Chron.") at 1–2; Pls.' Chron. at 13.) [3]

In a letter to the Department dated March 20, 1995, defendant-intervenors suggested ore two as a possible surrogate for manganese ore used to produce manganese metal in China. On April 12, 1995, and again on May 23, 1995, plaintiffs responded to and challenged defendant-intervenors' submissions advocating ore two as a surrogate. Plaintiffs argued "the price reported for the 'metallurgical grade' ore cannot be used as a surrogate" because ore two "has an insufficient or inadequate manganese-to-iron ratio [4] and is not comparable to ore used in manganese metal production in the PRC." (App. to Pls.' Mem. in Supp.of Mot. for J. Upon Admin. R. ("Pls.' App.") tab 8 at 3.) Plaintiffs cited to the affidavit of their expert, chemist and metallurgist Dr. J.C. Agarwal, who reviewed defendant-intervenors' March 17, 1995 submission to Commerce. Dr. Agarwal concluded "[b]ecause the reported 'metallurgical grade' ore is used only in pig iron applications in India and priced as a premium iron ore, its price cannot be used as a surrogate for the price of manganese ore in China." (Pls.' App. tab 8, attach. 1; Agarwal Aff. at 10.) Dr. Agarwal emphasized that a manganese ore comparable to the ore used to produce manganese ore in China would have to be a true manganese ore. Dr. Agarwal asserted ore two, submitted by defendant-intervenors, was not an ore used to produce manganese ore and therefore was not useable in making manganese products. Based on this information, plaintiffs argued ore two was not comparable and was inappropriate for use in Commerce's antidumping analysis as a surrogate for the Chinese ore.

Plaintiffs did not make any indication to Commerce ore two could be used if certain adjustments were made, but instead argued Commerce should use ore one as a surrogate in its antidumping investigation. (*See* Pls.' App. tab 8; Pls.' App. to Pls.' Reply to Def.'s Mem. in Opp'n, tab 1). On June 2, 1995,

defendant-intervenors responded once again that ore two was the most suitable surrogate ore because it most closely resembled the Chinese manganese ore. Defendant-intervenors argued the manganese content of ore two more closely matched the Chinese ore than ore one, which was proposed by the plaintiffs.

On June 14, 1995, Commerce published its *Preliminary Determination,* choosing as its surrogate the export price for ore three, a low-grade manganese ore (26–28 percent Mn content), obtained by the Department based on an actual transaction price published in the July 7, 1992 issue of the TEX Report. *See Preliminary Determination,* 60 Fed. Reg. at 31,285. Following Commerce's publication of its *Preliminary Determination,* plaintiffs requested Commerce ascertain, during verification, the manganese-to-iron ratios of the manganese ore used by the Chinese producers in producing manganese metal. Commerce obtained the requested ratios and, on September 19, 1995, relayed the information to Kerr–McGee.

On November 6, 1995, Commerce published its *Final Determination* which found imports of manganese metal from the PRC were being, or were likely to be, sold at less than fair value in the United States. *See Final Determination,* 60 Fed.Reg. 56,045. In the *Final Determination,* as a surrogate for manganese ore used in China, Commerce chose ore two, the price for metallurgical grade manganese ore (30–35 percent Mn) from the *1993 Indian Minerals Yearbook* submitted by defendant-intervenors, instead of ore three, which was used as the surrogate ore in the *Preliminary Determination. Id.* at 56,047. Commerce noted

> We are no longer using the surrogate value for manganese ore which was used at the preliminary determination. We are using a surrogate value for manganese ore from the Indian Minerals Yearbook 1993 because this ore has a manganese content

---

**3.** At the conclusion of a telephone conference on November 15, 1996, this Court requested the parties to compile a chronology of events comprising the administrative proceeding to assist the Court in ruling on plaintiffs' Motion to Settle the Record.

**4.** Plaintiffs argue that the manganese-to-iron ratio was the determinant of comparability among manganese ores. (Pls.' Mem. in Supp. of Mot. for J. Upon Admin. R. ("Pls.' Mem.") at 7.)

that is comparable to the ore used by the PRC producers and also represents a domestic price in India. We adjusted the value of the manganese ore to reflect a delivered price.

*Id.*

On November 17, 1995, Kerr–McGee submitted to Commerce proposed "corrections to the final dumping margin calculations," pursuant to 19 C.F.R. § 353.28 (1994), which allegedly identified "ministerial errors" made by Commerce in the *Final Determination.* (Pls.' App. to Mem. in Supp. of Mot. To Settle R., tab 28 at 1.) Kerr–McGee argued it was *"technically* infeasible, as a matter of basic chemistry, to use the Department's surrogate ore" without "adding a reduction process and correcting for the direct process chemical usage," and submitted adjustment formulae for Commerce to apply in making the alleged necessary adjustments. (*Id.* at 2.) Plaintiffs argued Commerce erred when it adopted in its *Final Determination* an ore which is significantly less expensive than and chemically dissimilar to Chinese ore.

After publication of the *Final Determination,* Commerce made no adjustments for direct process chemical usage. Commerce noted in its *Amended Final Determination* that it considered certain arguments raised by plaintiffs to be non-ministerial, and stated its choice and application of a specific surrogate manganese ore value does not qualify as a "clerical error." Commerce explained:

> We agree with respondents that petitioners' claim is not a clerical error pursuant to 19 C.F.R. 353.28(d). Furthermore, the information supporting petitioners' clerical error allegation represents *untimely-filed new information.* Accordingly, the Department has not considered this issue and has *removed the information submitted by petitioners* in support of this argument, as well as respondents' rebuttal to this information, *from the record* (*see* 19 C.F.R. 353.31(a)(3)).

*Amended Final Determination,* 61 Fed.Reg. at 4,416 (emphasis added).

Plaintiffs moved this Court to supplement the administrative record by restoring the redacted portion of plaintiffs' submissions so reference could be made to the information they contained when the administrative determination was reviewed on the merits. In *Kerr–McGee Chemical Corp. v. United States,* 955 F.Supp. 1466, 1474 (CIT 1997) ("*Kerr–McGee I*"), this Court denied Kerr–McGee's Motion to Supplement the Administrative Record, holding because Kerr–McGee was on notice from the investigation's outset that Commerce was considering five possible surrogate ores, Commerce was not obligated to notify the parties after the *Preliminary Determination* that a different surrogate ore would be selected in the *Final Determination.* The Court also held the information in Kerr–McGee's submissions did not identify ministerial errors, but rather raised new factual information that was untimely submitted. Kerr–McGee now challenges Commerce's choice of surrogate ore on the merits.[5]

## B. Electricity

Electricity is a primary input in the production of manganese metal. As a result, during the underlying investigation, defendant-intervenors reported, and the Department verified, the levels of electricity consumed by various producers of manganese metal in the PRC. In its verification reports Commerce specifically discussed how it verified the electricity consumption rates reported by the various respondents. On September 29, 1995, Kerr–McGee submitted argument and factual information regarding certain issues that had arisen during verification, and attached the affidavit of its expert, Dr. Agarwal, in which he argued the electricity rates reported by most of the respondents were "unrealistically low." Dr. Agarwal used figures from a reference book published in 1967 to provide an equation to

---

**5.** In *Kerr–McGee Chemical Corp. v. United States,* — CIT ——, 985 F.Supp. 1162 (1997) ("*Kerr–McGee II"*), this Court granted defendant's Motion to Strike nine items from Plaintiffs' Reply to Defendant's Memorandum in Opposition to

Plaintiffs' Motion for Judgment Upon the Administrative Record. This Court held the nine items were not part of the record on appeal before this Court and accordingly, would not be considered by this Court in its deliberations.

allegedly demonstrate the minimum levels of electricity consumption required for the electrolysis of manganese metal.

On October 2, 1993, Kerr–McGee filed its administrative case brief with the Department, arguing that the verified electricity consumption rates were understated for any plant producing manganese metal. Kerr–McGee responded that Commerce should base electricity values for PRC producers of manganese metal on the best information available ("BIA") because of the alleged under-reporting of electricity costs by defendant-intervenors. One respondent, China Hunan, submitted a rebuttal brief, noting each producer had presented its electricity records to the Department, and indicating the Department had reviewed these records carefully during verification. China Hunan's rebuttal brief additionally criticized Kerr–McGee's reliance on a thirty-year old reference book discussing consumption rates for two plants which no longer produce manganese metal. The rebuttal brief also cited to 19 C.F.R. § 353.52(c), which permits the Department to value the factors of production using verified information.

On October 16, 1993, the Commerce employees working on this investigation ("the manganese metal team") issued a memorandum to the Deputy Assistant Secretary discussing major issues for the *Final Determination*. (*See* Pls.' App. tab 25.) The team recommended the Department use the verified data for electricity consumption and use total electricity consumed by respondents, as opposed to just that consumed in the electrolysis process, to the extent that electricity was not included in factory overhead. (*Id.* at 3.) In the *Final Determination*, the Department explained its position regarding the electricity issue as follows:

> While the domestic and PRC production processes are fundamentally the same, there are some important differences between the two. For example, the PRC producers use a certain input (Factor A) which improves electricity current efficiencies; *i.e.*, all things being equal, the elec-

trolysis stage of the process requires relatively less electricity in the presence of Factor A.

> Given the large number of variables (*e.g.*, different production processes and inputs), it is unknown whether the use of Factor A can fully explain the difference in the electricity consumption reported by producers and the levels submitted by petitioners. However, based upon information supplied by the U.S. Bureau of Mines, we have determined that the electricity usage reported by respondents is not outside the range that would be expected for a producer using Factor A (*see* the October 16, 1995 memorandum to Barbara R. Stafford, Deputy Assistant Secretary, Import Administration). Therefore, the Department has used the verified amounts of electricity consumption.

*Final Determination,* 60 Fed.Reg. 56,050–51.[6]

## CONTENTIONS OF THE PARTIES

### A. *Plaintiffs*

Plaintiffs raise three challenges to the *Final Determination*. First, plaintiffs challenge the Department's choice of surrogate ore used to value the manganese ore used by respondents to produce manganese metal. Plaintiffs argue Commerce's choice of a low-priced, low grade ore from India used to make pig iron as a surrogate for the ore used to produce manganese metal in the PRC is not supported by substantial evidence on the record and is not otherwise in accordance with law. Plaintiffs ask this Court to remand this issue to Commerce with instructions to select another surrogate manganese ore from the information in the record and, after the parties have had a chance to comment and reply, to recalculate normal value of the subject merchandise.

Second, plaintiffs argue the Department's decision to value electricity using the quantities reported by respondents and verified by the Department is unreliable and is not supported by record evidence. Plaintiffs argue

---

**6.** "Factor A" is the Department's insert for a confidential additive used in the production of manganese metal in the PRC.

this Court should remand the *Final Determination* and instruct Commerce to reconsider whether defendant-intervenors have seriously under-reported electricity usage and whether best information available should be used to recalculate the subject merchandise's normal value.

Finally, plaintiffs also argue Commerce violated their due process rights by changing the choice of a surrogate ore used to value the manganese ore used by Chinese producers of manganese metal between the *Preliminary* and *Final Determinations*. Plaintiffs argue the Department did not afford plaintiffs due process because the Department failed to give the parties notice of, and an opportunity to comment on, its change in surrogate ore. (Pls.' Reply to Def.'s Answer to Pls.' Mot. For J. Upon Admin. R. and Mem. in Supp. Thereof ("Pls.' Reply") at 4–5.)

B. *Defendant*

Defendant argues Commerce's choice of a surrogate ore to value the manganese ore used by the Chinese producers of manganese metal was reasonable, supported by substantial evidence on the record and otherwise in accordance with law, because Commerce chose a surrogate based upon a comparison between the manganese content of the surrogate ore and the manganese content of the ore used in the PRC, as well as Commerce's policy not to use Indian export prices to value factors of production.

Defendant also maintains Commerce's decision to use the electricity rates reported by defendant-intervenors was reasonable, supported by substantial evidence and otherwise in accordance with law, because Commerce verified the accuracy of defendant-intervenors' electricity values.

Finally, defendant argues Kerr–McGee was not denied due process when Commerce used a different surrogate ore in the *Final Determination* than it had utilized in the *Preliminary Determination* because Kerr–McGee was on notice from the investigation's outset that the surrogate ore ultimately chosen was one of the potential surrogate ores being considered by Commerce. Defendant additionally asserts Kerr–McGee's third

claim has already been rejected by this Court in *Kerr–McGee I* and additionally in *Kerr–McGee Chemical Corp. v. United States*, —— CIT ——, 985 F.Supp. 1162, (1997) ("*Kerr–McGee II* ").

## STANDARD OF REVIEW

■ In reviewing a final determination by Commerce, this Court must sustain the determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is that which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citation omitted), *quoted in Matsushita Elec. Indus. Co., Ltd. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984). For purposes of judicial review, the evidence before this Court is limited to the evidence contained in the administrative record. *See Neuweg Fertigung GmbH v. United States*, 16 CIT 724, 726, 797 F.Supp. 1020, 1022 (1992).

■ The Court must accord substantial weight to the agency's interpretation of a statute it administers. *See American Lamb Co. v. United States*, 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). While Commerce has discretion in choosing one interpretation over another, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), *cited in Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) ("[T]his Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute"), *aff'd*, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). The Court is not to substitute its own determination for the agency's but rather is to determine whether Commerce's determination is supported by substantial evidence on the record

and is otherwise in accordance with law. *See, e.g., Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (noting "the possibility of drawing two inconsistent conclusions from the evidence does not permit an administrative agency's finding from being supported by substantial evidence"); *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467–68 (reviewing court may not "even as to matters not requiring expertise ... displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ").

## DISCUSSION

I. Commerce's Choice of a Surrogate Value for Manganese Ore

■ Kerr–McGee argues Commerce's choice of a low-priced, low grade ore from India used to make pig iron and not manganese metal as a surrogate to value ore used to produce manganese metal in the PRC is not supported by substantial evidence on the record, is not otherwise in accordance with law and "very seriously understate[s] the antidumping duty margins." (Pls.' Mem. in Supp. of Pls.' Mot. for J. on Admin. R. ("Pls.' Mem.") at 4.) Plaintiffs contend an Indian ore that is chemically comparable to ore used in the PRC should have been selected because "[t]here is no evidence in this record that ores with similar concentrations of contained manganese, but disparate manganese/iron ratios, are comparable." (*Id.* at 24.)

Plaintiffs maintain although their experts clearly stated the manganese-to-iron ratio is the key determinant of comparability among manganese ores, "in the final determination, the Department determined the sole criterion of comparability among manganese bearing ores was in contained manganese." (*Id.* at 8 (footnote omitted).) Plaintiffs argue "the evidence of record establishes that [the Indian] ore used for pig iron is not in fact used nor can it be used to make electrolytic manganese metal." (*Id.* at 22.) Additional-

ly, plaintiffs maintain "[n]o party objected to [ore three]." (*Id.* at 16.)

In support of their argument, plaintiffs again refer to the opinion of their expert, chemist and metallurgist Dr. J.C. Agarwal, who concludes "[b]ecause the reported 'metallurgical grade' ore is used only in pig iron applications in India and priced as a premium iron ore, its price cannot be used as a surrogate for the price of manganese ore in China." (Pls.' App. tab 8, attach. 1; Agarwal Aff. at 10.) Plaintiffs also argue Dr. Agarwal's views on the comparability of the Indian and Chinese ores is consistent with the opinion of defendant's manganese expert Mr. Thomas Jones of the United States Bureau of Mines, who noted the "metallurgical grade" ore in the *Indian Minerals Yearbook* would be used in blast furnace production of ferromanganese or pig iron because of its high iron content.

Plaintiffs cite a recent decision by this Court in maintaining "different physical properties or lack of interchangeability disqualifies comparability and warrants remand." (Pls.' Mem. at 25 (*citing Union Camp Corp. v. United States,* 941 F.Supp. 108 (CIT 1996)).) Plaintiffs assert "the use of the pig iron ore from India as a surrogate" is incorrect because "[i]t is absolutely not interchangeable with carbonate ore [used to produce manganese metal] in the PRC" and "cannot be used in place of Chinese ore." (*Id.* at 28.) Plaintiffs conclude "the measure of comparability among ores used to produce manganese is purity not concentration" and assert "[t]here are prices for ores, which are comparable to Chinese ores, in the record." (*Id.*)

Finally, plaintiffs argue in the course of Commerce's making its *Preliminary Determination,* two Department memoranda dated October 16, 1995 and October 18, 1995 disclosed to plaintiffs only after the *Final Determination,* demonstrate and affirm Commerce's "radical change of course and reliance on information from outside the record." (*Id.* at 17.) [7]

7. Defendant responds to this argument by stating:

Kerr–McGee attempts to impugn Commerce's determination by alleging that Commerce "relied upon information outside of the record"

Defendant argues Commerce's choice of a surrogate ore to value the manganese ore used to produce manganese metal in China is reasonable, supported by substantial evidence on the record, and is otherwise in accordance with law because Commerce chose a surrogate ore based upon a comparison between the manganese content of the surrogate ore and the Chinese ore and because of Commerce's policy of not using Indian export prices to value factors of production. Defendant explains "finding appropriate ore surrogates in this case was relatively difficult", because although Chinese producers of manganese metal use a low-grade manganese ore, this ore " 'cannot be sold on the world market because of its low quality and associated transportation costs.' " (Def.'s Mem. in Opp'n to Pls.' Mot. for J. Upon Admin. R. ("Def.'s Mem.") at 41 (citation omitted).) Based on these considerations, defendant-intervenors suggested to Commerce the appropriate surrogate should be a low-grade, low-quality ore that cannot be sold on the world market. Defendant adds Commerce learned during the course of its investigation that "the vast majority of published prices for manganese ore are for high-grade ores" and "the universe of reasonable surrogate options was extremely limited." (Id. at 42.)

Defendant continues to explain that Commerce ultimately was able to obtain only two prices for low-grade manganese ore, a price submitted by defendant-intervenors for metallurgical grade manganese ore (30–35 per-

cent Mn) from the *1993 Indian Minerals Yearbook* ("ore two") and an export price obtained by the Department for low-grade manganese ore (26–28 percent Mn content) based on an actual transaction price published in the July 7, 1992 issue of the TEX Report, reporting the price agreed to in a contract between an Indian mine and two Japanese purchasers for 25,000 tons of manganese ore ("ore three"). Defendant argues Commerce's rationale for choosing ore two— because it " 'has a manganese content that is comparable to the ore used by the PRC producers and also represents a domestic price in India' "—is "reasonable and supported by the record." (Id. at 43 (quoting *Final Determination,* 60 Fed.Reg. at 56,-047).)

Defendant further argues "it is undisputed that the manganese content of ore 2 is similar to that of the Chinese ore" and "both precedent and the record support the Department's selection of a surrogate ore based upon the comparability of manganese content." (Id. at 43.) Defendant maintains it is too late for plaintiffs to criticize the Department for choosing ore two based upon its manganese content because plaintiffs failed to raise this argument before the Department or object to defendant-intervenor's suggestion that Commerce should choose as a surrogate ore an ore with a manganese content as close as possible to that of the Chinese ore. Defendant concludes plaintiffs should be precluded from now arguing Com-

because, in its recommendation regarding the appropriate choice of surrogate ore, the manganese metal team referenced a Department memorandum counseling against the use of export prices from India by the investigation number of another case. *See* Pl. Br. at 20. The reference to a different investigation was a typographical error. As Kerr–McGee concedes, with the exception of the different investigation number, this memorandum was the same memorandum that was sent to the parties at the beginning of the investigation cautioning against using Indian or Pakistani export prices to value the factors of production. *See* Pub. Doc. 37, Fiche 10; Exhibit 6. (Def.'s Mem. in Opp'n to Pls.' Mot. For J. Upon Admin. R. ("Def.'s Mem.") at 45 n. 17.) This Court agrees with defendant's arguments and additionally notes it has already disposed of plaintiffs' argument that

[t]he Department's selection of a surrogate ore that it had previously rejected, its justification for its decision on ore, and its explanation . . . were all in memoranda released for the first time to Petitioners after the final determination was made, thereby depriving Petitioners of the opportunity to comment on those critical factual determinations.

(Pls.' Reply to Def.'s Answer to Pls.' Mot. For J. Upon Admin. R. and Mem. in Supp. Thereof ("Pls.' Reply") at 4 (footnote omitted).) *See Kerr–McGee I,* 955 F.Supp. at 1474–75 (Court found plaintiffs were on notice Commerce was considering ore two as surrogate long before it changed ores between *Preliminary and Final Determination* ); *see also Kerr–McGee II,* —— CIT at ——, 985 F.Supp. at 1165 (reaffirming Court's decision in *Kerr–McGee I* and noting plaintiffs were not prejudiced when Commerce changed its selection of surrogate ore).

merce cannot base its choice of ore upon manganese content and must base its decision on manganese-to-iron ratio.

Defendant additionally argues the Department's second rationale for selecting ore two, a preference for an ore representing a domestic instead of an export price, "was also valid." (*Id.* at 45.) Defendant explains "[t]he Department's practice is to avoid using Indian export prices to value the factors of production because India maintains non-specific export subsidies", and contends Commerce's "practice is rooted firmly in the statute." (*Id.*)

Finally, defendant argues "[n]one of the other arguments made by Kerr–McGee regarding the unsuitability of ore 2 as a surrogate for the Chinese ore present a basis for disturbing Commerce's determination that ore 2 was a reasonable surrogate ore." (*Id.* at 47.) First, defendant emphasizes "[c]ontrary to Kerr–McGee's assertions, the evidence of record establishes that ore 2 can be used to produce manganese metal" and because ferromanganese is not the subject merchandise "[i]t simply does not matter whether ore 2 can be used to make ferromanganese." (*Id.* at 48, 50 (footnote omitted).) Second, in addressing Kerr–McGee's argument on the issue of whether, if Commerce chose ore two as a surrogate, it should be adjusted to reflect the manganese-to-iron ratio, defendant cautions the Court to "be mindful of the extent to which Kerr–McGee's case brief misrepresents the evidence upon the record regarding this point." (*Id.* at 51.) Defendant argues Kerr–McGee never raised its "purity" argument during the course of the administrative proceeding and "[t]his Court has already determined that Kerr–McGee failed to present to Commerce in a timely fashion its argument about the need to adjust a surrogate ore to account for direct process chemical usage." (*Id.* at 52.) Defendant concludes Commerce discussed the manganese-to-iron ratios of the various ores in choosing a surrogate for the final determination and "given the similar manganese-to-iron ratio of ore 2 and ore 3, Kerr–

McGee must concede that ore 2 is a reasonable surrogate." (*Id.* at 53.)

After considering the evidence and arguments of the parties, this Court finds Commerce's choice of ore two as a surrogate ore is reasonable, supported by substantial evidence on the record, and is otherwise in accordance with law. Kerr–McGee presents this Court with no compelling basis for disturbing Commerce's determination. Although Commerce expressed some reservation regarding ore two, noting "[t]he relatively low manganese-to-iron ratio indicates that this ore would probably not be used in the production of manganese metal," Commerce also expressed reservations about the continued use of ore three and stated

[t]his low manganese-to-iron ratio indicates that this ore would probably not be used in the production of manganese metal because it is not commercially feasible. As the percentage of iron in the ore increases, greater amounts of reagents [8] (*i.e.*, chemicals) must be used in the solution-making phase.

(*Memorandum dated Oct. 18, 1995 from Manganese Metal Team to Susan G. Esserman, Ass't Sec. For Import Admin.*, in Def.'s App. tab 34 at 4.) The Court notes Commerce considered the pros and cons of both ore two and ore three and decided "the manganese content of [ore two] is more comparable to the ore used by the Chinese producers than the ore with a higher manganese content." (*Id.*) Commerce additionally noted because ore two has a manganese content that is comparable to the one used by the PRC producers, "this reduces the overcounting that would result if a higher grade ore were used." (*Id.* at 6.) In responding to plaintiffs' preference for ore three, Commerce concluded while "[ore three] has a manganese content which is marginally closer to the manganese content in the ore used by the PRC producers, we recommend [ore two] because it represents a domestic Indian price. (Note: the manganese content for [ore two and ore three] are similar.)" (*Id.*)

Moreover, Commerce chose not to use ore three in the *Final Determination* because it

---

**8.** Webster's Third New International Dictionary defines reagent as "a substance used for various purposes ... because it takes part in one or more chemical reactions or biological processes."

was an export price, and the Department practice is not to use Indian export prices because India maintains non-specific export subsidies. Commerce stated ore two

provides a domestic Indian price. A domestic price is beneficial because, as noted in the *Indian Minerals Yearbook: 1993,* manganese ore is usually sold by the Indian mines to domestic consumers either at the rail-head or ex-plant. Therefore, the domestic price does not require adjustment to account for transportation costs....

(*Memorandum dated July 26, 1995 from Manganese Metal Team to Barbara R. Stafford, Dep. Ass't Sec. For Investigations,* in Def.'s App. tab 14 at 11.) This Court finds Commerce's policy not to use Indian export prices is supported by substantial evidence on the record and is otherwise in accordance with law. The Court notes in the legislative history to 19 U.S.C. § 1677b(c), Congress advised Commerce, in valuing the factors of production, to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R. Rep. 100–576 at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623; *accord Tehnoimportexport, UCF America Inc. v. United States,* 16 CIT 13, 17, 783 F.Supp. 1401, 1405 (1992) (referencing legislative history and noting "Commerce repeatedly has failed to base foreign market value upon surrogate countries' prices for exports if those exports may benefit from subsidies or are being dumped"). As a result, this Court holds Commerce's decision to select ore two instead of ore three as a surrogate to value the manganese ore used by respondents in producing manganese metal is supported by substantial evidence on the record and is otherwise in accordance with law.

## II. Commerce's Use of Electricity Rates

▇ Plaintiffs argue the Court should remand the *Final Determination* to Commerce with instructions to reconsider whether defendant-intervenors have seriously under-reported electricity usage and whether best information available should

be used to recalculate the subject merchandise's normal value. Although plaintiffs note "the Department duly verified reported electricity consumption," they add "the verified result does not cover all production uses of electricity and remains inexplicable and unreasonable." (Pls.' Mem. at 9.) Plaintiffs argue they previously put Commerce on notice in their petition that "the provision of electricity to manganese plants in the PRC was subsidized and otherwise benefitted." (*Id.* at 28 (footnote omitted).) Kerr–McGee argues "[t]he Department cannot explain fundamental inconsistencies in levels of electricity consumption and they are lower than consumption levels described by Dr. Agarwal." (*Id.* at 33.)

Plaintiffs suggest the Department should have reopened the record after the antidumping hearing to develop the record on the effects of a particular additive ("Factor A")[9] on electricity consumption in defendant-intervenors' operations in the PRC. Plaintiffs argue the use of certain inputs (*i.e.* Factor A) does not explain respondents' low electricity consumption. Plaintiffs maintain they pointed out in the antidumping hearing that respondents using more of Factor A reported the most electricity consumption and those reporting the least use of Factor A reported the least use of electricity. In addition, plaintiffs add they pointed out that the difference in amounts of electricity used was very great, "suggesting that the source of respondent data on electricity consumption reported to the Department had proved to be unreliable." (Pls.' Reply at 37.) Plaintiffs additionally contend they pointed out respondents reporting the usages of electricity were reporting consumption levels below practical minimums.

Plaintiffs argue

[a]t this point in the investigation the Department had the choice of investigating further—requesting more reliable information from the Chinese producers to reconcile differences, or it could try to otherwise justify the results, or it could use best

---

**9.** "Factor A" is the Department's insert for a confidential additive used in the production of manganese metal in the PRC. *See supra,* note 6.

information available as Plaintiffs suggested. It chose a path of justification from information outside the record. (*Id* at 38.) Plaintiffs conclude Commerce's "failure to perform an independent investigation of the facts related to this investigation falls short of its statutory duty to investigate antidumping cases and assign fair antidumping margins." (Pls. Mem. at 34.) Plaintiffs suggest Commerce should have used "the best information available, [which plaintiffs claim is] Great Wall's electricity consumption, which meets all the tests." (*Id.* at 33.) [10] Plaintiffs request this Court remand the *Final Determination* so Commerce can reconsider and explain "why it concludes reported electricity usage by Defendant–Intervenors is not below practical minimums" and "how it reconciles high and plausible reported electricity consumption and high use of [Factor A] with far lower electricity consumption and lower use of [Factor A] by Defendant Intervenors, and give the parties an opportunity to comment and reply." (*Id.* at 43.)

In addressing plaintiffs' challenge of the Department's decision to value electricity using the quantities reported by respondents and verified by the Department, defendant argues Commerce's decision to use the electricity rates reported by respondents is reasonable, supported by substantial evidence on the record and is otherwise in accordance with law because Commerce verified the accuracy of respondents' electricity values.

Under 19 U.S.C. § 1677m(i) (1994), Commerce is required to verify information relied upon in reaching its final determination. Defendant argues Commerce has "wide latitude" in its verification procedures and " '[i]t is within the discretion of Commerce to determine how to verify' " and " 'due deference will be given to the expertise of the agency.' " (Def.'s Mem. at 54–55 (quoting *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 532, 622 F.Supp. 1071, 1082 (1985) (further citation omitted)).) Defendant explains in this case, Commerce officials traveled to the PRC and verified the information contained in respondents' questionnaire responses.

Defendant also notes Commerce verified the accuracy of the electricity consumption rates reported by respondents, and based upon the results of its verification and further corroboration using information from the U.S. Bureau of Mines, Commerce concluded respondents had accurately reported their values for electricity and used that information in the *Final Determination.*

Defendant maintains Kerr–McGee does not question the reasonableness of Commerce's verification methodology. Defendant argues "Kerr–McGee's position is without merit because Kerr–McGee failed to provide any evidence sufficient to question the accuracy of China Hunan's verified figures" and "[i]n the end, Kerr–McGee's arguments boil down to speculation, not proof. Such speculation is an insufficient justification for the Department to disregard verified data." (*Id.* at 56, 61.)

Defendant maintains Kerr–McGee fails to account for the effect of Factor A upon electricity efficiency, and its table "did not establish the minimum range of electricity necessary for electrolysis when [Factor A] is used. Therefore, Kerr–McGee's table has no probative value for evaluating the reliability of the PRC electricity values." (*Id.* at 57 (footnote omitted).) Defendant responds to plaintiffs' reference to Dr. Agarwal's findings by asserting "[t]he only mention of [Factor A] by Dr. Agarwal was a bald assertion that the additive could not account for China Hunan's electricity usage values.... Dr. Agarwal did not submit any documentary evidence upon the effects of [Factor A], and his reference book did not mention [Factor A] at all." (*Id.* at 57 n. 30.) Defendant concludes "the calculations that formed the basis for Kerr–McGee's table did not account for the effect of [Factor A]." (*Id.* at 58.) Finally, defendant argues the technical article used by the Department to evaluate the effect of Factor A, and to which plaintiffs object, was "merely used ... to corroborate the reasonableness of the electricity rates that [the Department] had already verified in China." (*Id.* at 60.)

10. Plaintiffs contend Great Wall, a manganese metal producer located in the PRC, reported electricity consumption within minimum operational requirements.

In response to plaintiffs' argument Commerce should have reopened the record to develop the record on the effects of Factor A on current efficiencies in the kind of operations defendant-intervenors have in the PRC and resolve the contradictions, defendant concludes

> [i]f Kerr–McGee had wanted to comment upon the effect of [Factor A], it should have done so in a timely manner. Nothing prevented it from doing so.... Given Kerr–McGee's failure to act in a timely manner, it can hardly complain if its ability to influence the decisionmaking process was lost.

(*Id.* at 62.)

After considering the evidence and arguments of the parties, this Court finds Commerce's decision to rely upon respondents' verified data is supported by substantial evidence on the record and is otherwise in accordance with law. This Court has determined that " '[t]he decision to select a particular [verification] methodology rests solely with Commerce's sound discretion.' " *Torrington Co. v. United States,* 17 CIT 967, 974, 832 F.Supp. 405, 411 (1993) (*quoting Hercules, Inc. v. United States,* 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987).)

### III. Due Process Argument

This Court finally turns to plaintiffs' argument Commerce violated their due process rights by changing the choice of a surrogate ore to value the manganese ore used by respondents to produce manganese metal between the *Preliminary* and *Final Determinations.* Plaintiffs explain Commerce's "erroneous selection" of a surrogate manganese ore in the *Final Determination* could have been avoided "if Plaintiffs had had an opportunity to comment on the Department's erroneous justification." (Pls.' Reply at 3.) Plaintiffs conclude "[t]his Court has held that the Department has an obligation to notify parties and to give them an opportunity to comment in such circumstances." (*Id.* at 4–5 (footnote omitted).) Plaintiffs maintain "[t]he procedure followed by the Department

in the manganese metal investigation that resulted in the change in surrogate ore was not in accordance with law, was fundamentally unfair to Plaintiffs ... and denied Plaintiffs due process of law." (*Id.* at 4.) [11]

■ Defendant disagrees Commerce violated plaintiffs' due process rights by changing the choice of surrogate ore used to value the Chinese manganese ore between the *Preliminary* and *Final Determinations.* Defendant emphasizes this claim "has already [been] considered, and rejected" by this Court, (Def.'s Mem. at 63), citing the decision in *Kerr–McGee I,* where this Court held plaintiffs were on notice from the beginning of the investigation that Commerce was considering five possible ores as an option for its choice of a surrogate and was not obligated to notify the parties after the *Preliminary Determination* that a different surrogate ore would be utilized in the *Final Determination.*

This Court agrees with defendant's arguments and notes it has already responded to plaintiffs' arguments they were 'denied an opportunity to contest Commerce's substitution of a surrogate ore. *See Kerr–McGee I,* 955 F.Supp. at 1474–75 (denying plaintiffs' application to supplement record with comments alleging inappropriate ore selection after finding plaintiffs were on notice Commerce was considering ore two as surrogate before it changed ores between *Preliminary and Final Determinations* ); *see also Kerr–McGee II,* —— CIT at ——, 985 F.Supp. at 1165 (reaffirming Court's decision in *Kerr–McGee I* and noting plaintiffs were not prejudiced when Commerce changed its selection of surrogate ore).

This Court notes plaintiffs' citation to *Sigma Corp. v. United States,* 17 CIT 1288, 841 F.Supp. 1255 (1993), where the Court held Commerce's failure to afford notice or opportunity to comment on Commerce's change from a company-specific rate to a country-wide rate between the preliminary and final results was a violation of plaintiffs' due process rights. In *Sigma Corp.,* the Court

---

11. This Court will consider plaintiff's due process argument as one falling under the 5th

Amendment although plaintiffs did not specifically refer to the 5th Amendment in their papers.

found a deprivation of rights because the preliminary determination failed to mention Commerce was considering a country-wide rate. *See Sigma Corp.*, 17 CIT at 1303, 841 F.Supp. at 1267. In this case, the Court already has determined plaintiffs knew ore two was a possible surrogate ore and had several opportunities to comment on its use and selection. Plaintiffs even acknowledged this fact when they submitted an affidavit of their expert who disqualified ore two as an appropriate surrogate after defendant-intervenors proposed using ore two as the surrogate ore in March, 1995. (*See* Pls.' App. tab 8, attach. 1; Agarwal Aff. at 10.) Therefore, unlike the plaintiffs in *Sigma Corp.*, the plaintiffs in this case were not prejudiced by Commerce's change in surrogate ores.

Plaintiffs' citation to *NAR, S.p.A. v. United States*, 13 CIT 82, 707 F.Supp. 553 (1989) lends further support to this Court's decision plaintiffs' due process rights were not violated when Commerce changed surrogate ores. In response to plaintiffs' due process argument in *NAR, S.p.A*, the Court concluded "a plethora of communications took place between NAR and Commerce throughout the administrative proceedings, rendering suspect NAR's assertion that it did not understand or perceive the actions Commerce took." *NAR, S.p.A.*, 13 CIT at 91, 707 F.Supp. at 561.

This Court also notes the decision in *Tehnoimportexport v. United States*, 15 CIT 250, 766 F.Supp. 1169 (1991), which defendant argues supports its position. In *Tehnoimportexport*, this Court recognized there is "no obligation on the part of [Commerce] to notify the parties beforehand that there would be a different surrogate used in the final determinations than in the preliminary determination." *Tehnoimportexport*, 15 CIT at 255, 766 F.Supp. at 1175. In *Tehnoimportexport*, the ITA changed the country selected as the surrogate in the final determination from the country selected in the preliminary determination without giving the parties notice that it intended to switch surrogates. This Court stated "[t]he reason for having both preliminary and final determinations is so the ITA can make corrections and adjustments to its preliminary findings and reach a more accurate conclusion in the final determination. Some changes are to be expected...." *Tehnoimportexport*, 15 CIT at 254, 766 F.Supp. at 1175. In *Tehnoimportexport*, this Court found the ITA had explained to the parties in the preliminary determination that additional fact finding as to the surrogate country would be necessary prior to the final determination and held plaintiff was aware that a country other than its own preferred choice might be selected as the surrogate in the final determination. *See Tehnoimportexport*, 15 CIT at 255, 766 F.Supp. at 1175.

In this case, while plaintiffs argue they were not on notice that the choice of surrogate was not settled in the *Preliminary Determination*, (*see* Pls.' Reply at 21), this Court previously found plaintiffs, like the plaintiff in *Tehnoimportexport*, were aware from the beginning of the investigation that Commerce was considering five possible ores as options for its choice of surrogate and that Commerce might select a different surrogate ore in the final determination. *See Kerr–McGee I*, 955 F.Supp. at 1474–75. As a result, this Court finds the decision in *Tehnoimportexport* lends support to its decision today that plaintiffs' due process rights were not violated by Commerce's change in surrogate ores.

That plaintiffs have a legitimate right of due process is not at issue. However, this Court finds for the reasons stated above, Commerce did not violate plaintiffs' due process rights when it changed its selection of surrogate ore between the *Preliminary* and *Final Determinations*. Rather, the Court holds plaintiffs were afforded the procedural rights to which they are entitled under the law.

## CONCLUSION

For the reasons discussed above, this Court denies plaintiffs' Motion for Judgment on the Administrative Record and sustains in its entirety Commerce's determination in *Notice of Final Determination of Sales at Less Than Fair Value: Manganese Metal From the People's Republic of China*, 60 Fed.Reg. 56,045 (Dep't Comm.1995) (final determ.), *as amended, Notice of Amended Final Determination and Antidumping Duty Order:*

*Manganese Metal From the People's Republic of China,* 61 Fed.Reg. 4,415 (Dep't Comm. 1996) (am. final determ.). This Court holds Commerce's decision to select ore two instead of ore three is supported by substantial evidence on the record and is otherwise in accordance with law. Additionally, this Court finds Commerce's decision to rely upon respondents' verified data for electricity consumption is supported by substantial evidence on the record and is otherwise in accordance with law. Finally, this Court finds plaintiffs' due process rights were not violated when Commerce changed the choice of a surrogate value for manganese ore between the *Preliminary* and *Final Determinations.*

### JUDGMENT ORDER

Upon due consideration of the motion submitted by plaintiffs and the opposition thereto, and upon all of the papers submitted herein by the parties and upon due deliberation, it is hereby

**ORDERED** that Plaintiffs' Motion for Judgment on the Administrative Record is denied; and it is further

**ORDERED** that Commerce's determination in *Notice of Final Determination of Sales at Less Than Fair Value: Manganese Metal From the People's Republic of China,* 60 Fed.Reg. 56,045 (Dep't Comm.1995) (final determ.), *as amended, Notice of Amended Final Determination and Antidumping Duty Order: Manganese Metal From the People's Republic of China,* 61 Fed.Reg. 4,415 (Dep't Comm.1996) (am. final determ.) is sustained in its entirety.